IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMADOU BARRY, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | |
| § | Case No. _____ |
| UNITED STATES OF AMERICA, § | |
| § | |
| Defendant. § | |

## COMPLAINT

Plaintiff Amadou Barry ("Plaintiff" or "Amadou") files this original Complaint against Defendant United States of America ("Defendant"), and alleges the following:

## INTRODUCTION

1. This case involves the unlawful detention of Plaintiff Amadou Barry, an asylum-seeker, in adult immigration custody by immigration agents of the United States for over four months while he was still a minor. During his over four-month wrongful imprisonment, Amadou was unable to speak to his family members, a lawyer or a mental health professional. He was not informed of his rights as a minor, not placed in the least restrictive setting as required by law for children held in immigration custody, and not evaluated for release to an adult sponsor. Alone, confused, deprived of the most basic access to justice and services, Amadou suffered, inter alia, severe emotional distress, depression, anxiety and fear, all of which continue today.

2. Although Amadou repeatedly informed Defendant's immigration officials that he was a minor, including in a sworn statement and by presenting a copy of his Guinean birth certificate,

United States immigration agents ignored their obligations under the laws that govern the treatment of non-citizen minors who seek refuge in the United States and violated the statutory mandates that protect these vulnerable individuals.

3. Amadou brings this action under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. ("FTCA"), seeking compensation for the harms and injures caused by Defendant.

## JURISDICTION & VENUE

4. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. § 1346(b).

5. This Court has supplemental jurisdiction over any pendent state law claims under 28 U.S.C. § 1367(a).

6. On February 25, 2020, Plaintiff submitted an administrative claim to United States Customs and Border Protection ("CBP"), the United States Department of Homeland Security ("DHS") and United States Immigration and Customs Enforcement ("ICE").  On March 15, 2021, CBP denied the administrative claim.  Accordingly, Plaintiff has exhausted all his administrative remedies. This action is timely filed within six months of the mailing of that notification of denial of his administrative claim, in accordance with the FTCA.  28 U.S.C.§§ 2675(a), 2401.

7. Venue is proper in this District under 28 U.S.C. § 1402(b), as Plaintiff resides in the Bronx, New York.

## THE PARTIES

8. Plaintiff Amadou Barry is a resident of the Bronx, New York.

9. Defendant United States of America is the appropriate defendant under the FTCA. 28 U.S.C. §§ 1346(b), 2671 *et seq*.

10. All federal officers referenced in this Complaint were at all relevant times employees of

the United States, working within the scope and course of their employment with federal agencies including, but not limited to ICE, CBP, and DHS and acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

## STATUTORY FRAMEWORK

11. The Homeland Security Act of 2002 transferred responsibility for all unaccompanied noncitizen minors ("unaccompanied children" or "UCs") in federal custody to the Office of Refugee Resettlement ("ORR"), a division of Health and Human Services ("HHS"). 6 U.S.C. § 279. The Homeland Security Act provides that ORR is responsible for "implementing policies with respect to the care and placement" of UCs and "ensuring that the interests of the child are considered in decisions and actions related to the care and custody" of minors. *Id*. § 279(b)(1).

12. The Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8.U.S.C. § 1232, codified protections for unaccompanied children.

13. As relevant here, the TVPRA mandates that DHS "***shall notify*** the Department of Health and Human Services [ORR] within 48 hours upon – (a) the apprehensive or discovery of an unaccompanied alien child; or (2) ***any claim or suspicion*** that an alien in the custody of such a department or agency is under 18 years of age." 8 U.S.C. § 1232(b)(2) (emphasis added). It further requires CBP and ICE to transfer UCs to ORR custody – and out of adult detention – within 72 hours absent "exceptional circumstances." 8 U.S.C. § 1232(b)(3). Indeed, the TVPRA requires that UCs are "***promptly placed*** in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A) (emphasis added).

14. The TVPRA requires CBP and ICE to "make a prompt determination" of the individual's age which "at a minimum . . . shall take into account *multiple forms of evidence, including the non-exclusive use of radiographs*." 8 U.S.C. § 1232(b)(4) (emphasis added).

15. The Flores Settlement Agreement ("FSA")[1] governs DHS's treatment of minors. Detained minors must be placed in "the least restrictive setting appropriate to the minor's age and special needs[.]" FSA ¶ 11. It requires DHS to segregate unaccompanied minors from unrelated adults. *Id.* ¶ 12.

16. DHS's own internal policies provide additional standards for age verification intended to safeguard minors in custody.

17. CBP guidance requires an individual is to be treated as a UC "if there is a reasonable claim or suspicion that [a noncitizen] in CBP custody is under 18 years of age."[2]

18. ICE requires age determinations to be made "based on the totality of all available evidence, including the statement of the individual in question."[3] This evidence may include government-issued documents, credible statements by persons with personal knowledge of the individual's age, and forensic bone or dental assessments performed by a medical professional. Significantly, judgements based on an individual's physical appearance are not included on the list of acceptable evidence. ICE's guidance *mandates* that individuals claiming to be minors "must also immediately be separated from unrelated adults and other minors" and "provided all of the services provided to minors until a formal age determination can be made."[4]

---

[1] Stipulated Settlement Agreement, *Flores v. Reno*, No. 85-4544 (C.D. Cal. Jan 17, 1997), *available at* https://www.aila.org/File/Related/14111359b.pdf (last accessed Sept. 14, 2021).

[2] U.S. Customs and Border Protection, *Interim Guidance on Processing Unaccompanied Alien Children* (Mar. 19, 2009), *available at* https://www.aila.org/File/DownloadEmbeddedFile/81285 (last accessed Sept. 14, 2021).

[3] U.S. Immigration and Customs Enforcement, *Juvenile and Family Residential Management Unit: Field Officer Juvenile Coordinator Handbook*, at 21-22 (Sept. 1, 2017), *available at* https://www.aila.org/File/DownloadEmbeddedFile/75783 (last accessed Sept. 14, 2021).

[4] *Id.* at 21.

**FACTUAL BACKGROUND**

    A.    **The United States' Unlawful Detention of Minor Children in Adult Facilities**

19.    Although the Department of Homeland Security has no authority to detain UACs in ICE-managed adult detention facilities, children have been wrongly detained by ICE on multiple occasions over the course of ICE's history.

20.    In November 2009, DHS's Office of the Inspector General reported that "ICE Does Not Track Age Determinations That Were Reversed" but found that 12 of 21 juvenile field coordinators reported instance of placement of juveniles in adult facilities or adults in juvenile shelters. "The frequency with which such inappropriate placements are identified ranged from twice over three years to *about three times per week*."[5]

21.    In the twelve years since this report, on information and belief, ICE has never established a system to track the erroneous placement of children in adult facilities. But numerous press outlets have documented these wrongful ICE detentions. *See, e.g.*, Aura Bogado, "Here's How ICE Sent Children Seeking Asylum to Adult Detention Centers," *Reveal News*, (May 3, 2018)[6]; Brittny Mejia, Kate Morrissey, "U.S. Is Using Unreliable Dental Exams To Hold Teen Migrants in Adult Detention," *Los Angeles Times* (June 2, 2019),[7] noting that the "handful of [reported] cases where a minor was released from adult detention is almost certainly an undercount, as most migrants held

---

[5] DHS, Office of the Inspector General, "Age Determination Practices for Unaccompanied Alien Children in ICE Custody," at 9 (November 2009), *available at* https://www.documentcloud.org/documents/4450510-DHS-OIG-Report-on-ICE (last accessed Sept. 14, 2021).

[6] *Available at* https://revealnews.org/blog/heres-how-ice-sent-children-seeking-asylum-to-adult-detention-centers/ (last accessed Sept. 14, 2021).

[7] *Available at* https://www.latimes.com/local/lanow/la-me-ln-immigrant-age-migrants-ice-dental-teeth-bangladesh-20190602-story.html (last accessed Sept. 14, 2021).

in adult detention do not have legal representation and are unlikely to fight their cases."

### B. Amadou's Flight from Life-Threatening Violence in Guinea At the Age of 16 and Journey from Brazil to Texas To Seek Asylum

22. Amadou was born in Conakry, Guinea on July 8, 2000.

23. In 2016, Amadou was detained and beaten by Guinean police as a result of his affiliation with a minority political party. Fearing for his life, Amadou flew to Brazil in November 2016. He was 16 years old.

24. After approximately seven months in Brazil, Amadou traveled to the U.S. border in the hopes of living with his cousin in New York. Amadou made the journey with a group of other individuals, one of whom informed him that if border officers in South and Central America learned that he was a minor, he would be detained and prevented from reaching the United States.

25. On or about July 22, 2017, Amadou was stopped and questioned at the border in Panama. He understood he could be prevented from continuing to the United States if border officers learned that he was a minor. In order to avoid separation and extended detention, Amadou indicated that his date of birth was July 8, 1992.

26. On or about August 21, 2017, Amadou entered Mexico. There, he called his father and asked him to obtain his birth certificate because he would need it when he reached the United States. Amadou had originally left Guinea with his passport but it had been lost in Brazil.

27. Amadou's father obtained his son's birth certificate from the Conakry municipal government on or about September 6, 2017. He emailed a scanned copy of the birth certificate to an individual with whom Amadou was traveling. The birth certificate, which has an official seal and signature, is titled, "*Transcription du judgement supplétif tenant lieu d'acte de naissance.*" That birth certificate accurately states that Amadou was born on July 8, 2000 in Conakry, Guinea.

28. According to the U.S. State Department, a *judgement suppletif* is issued by a court

whenever a birth is not registered within 6 months. It is the equivalent of an official birth certificate. *See* U.S. State Dep't, Reciprocity and Civil Documents by Country, https://travel.state.gov/content/travel/en/us-visas/Visa-Reciprocity-and-Civil-Documents-by-Country/Guinea.html (last accessed Sept. 14, 2021).

29. The *Judgment Suppletif* accurately states that Amadou was born on July 8, 2000.

30. On or about October 17, 2017, Amadou entered the United States at or near Hidalgo, Texas, with a printout of his birth certificate (in French), his mobile phone, and a backpack. He was 17 years old.

### C. Amadou's Repeated Statements to CBP and Submission of Documentary Demonstrating That He Was a Minor

31. Upon arrival in Hidalgo, Amadou immediately provided the printout of the *Judgment Suppletif* to the first CBP officer he encountered.

32. Amadou further informed the CBP officer in his initial interview that he was 17 years old.

33. In addition to the *Judgment Suppletif* and Amadou's statements to the CBP officer, Amadou testified in a sworn statement, on or about October 17, 2017, that he was 17 years old. In the sworn statement, Amadou testified as to why he previously told officers in Panama that he was 25 years old and he described at length the basis of for his flight from Guinea.

34. Upon information and belief, and despite the evidence that Amadou provided demonstrating that he was a minor, CBP did not notify the Office of Refugee Resettlement ("ORR") that Amadou was a minor or claimed to be a minor, as required by the TVPRA. Instead, the CBP officer told Amadou that a fingerprint record that had been generated when he passed through Central and South American countries indicated he was born in 1992. Amadou explained to the CBP officer that he had told Panamanian border officers that he was an adult because he feared deportation or separation if he told them his correct age.

35. On Form I-213, a CBP officer stated that Amadou "does not appear to be a minor…due to him physically appearing to be an adult…. Subject has all the physical characteristics of a mature adult. Male appears to have a fully matured facial structure."

36. The officer also noted – without elaboration or support – that Amadou's birth certificate "appeared to be home made and fraudulent."

37. CBP then placed Amadou into expedited removal proceedings under 8 U.S.C. ¶ 1225(b) and referred him for a credible fear interview.

    **D.** **Amadou's Over Four-Month False Imprisonment In Adult Immigration Detention at PIDC**

38. On or about October 18, 2017, CBP transferred Amadou to the Port Isabel Detention Center ("PIDC"), an adult detention facility operated by ICE in Los Fresnos, Texas.

39. Throughout his incarceration at PIDC, Amadou repeatedly informed ICE officers and other detainees that he was a minor. Upon information and belief and notwithstanding those repeated statements, ICE did not notify ORR that Amadou was a minor or claimed to be a minor, as required by the TVPRA, let alone transfer him into ORR custody as required by the TVPRA and Flores Settlement.

40. The PIDC is in many respects indistinguishable from a medium-security prison. It is objectively not the "least restrictive setting" for a child.

41. While at PIDC, Amadou was not allowed to wear his own clothing or move freely between different areas of the facility. During Amadou's time there, movement at PIDC was severely curtailed, with detainees being forced to stay in locked "pods" with scheduled, and very limited, outdoor time, if any.

42. Amadou was not separated from adult male detainees, some of whom were, upon information and belief, detained because of criminal conduct. He lacked privacy from other

detainees.

43. Amadou was unable to contact family members, consult with a lawyer or meet with a psychologist or therapist. As a result, his mental health deteriorated and he became anxious, fearful and depressed. Amadou's inability to meet with a lawyer contributed to his fear of future deportation and his lack of understanding as to what was happening to him. Amadou frequently cried. At night he was often unable to sleep due to fear and anxiety.

44. On or about November 1, 2017, Amadou attended a credible fear interview with an asylum officer. During the interview, Amadou reiterated multiple times that he was a minor and that the 1992 birth date that DHS had recorded for him was incorrect. The asylum officer found Amadou to be credible and specifically found that he had established his identity "with a reasonable degree of certainty." A Supervisory Asylum Office thereafter approved this determination, and DHS referred Amadou to removal proceedings before an Immigration Judge ("IJ").

      **E.**    **The Immigration Judge's Findings Regarding Amadou's Age**

45. Amadou appeared at immigration hearings before an IJ on four occasions while detained at PIDC: on November 28, 2017, December 5, 2017, January 22, 2018 and February 13, 2018. On all four occasions, he explained to the IJ that he was only 17 years old and that ICE was using the wrong date of birth.

46. In advance of an individual hearing before the IJ on January 22, 2018, Amadou submitted letters from his father and his cousin corroborating that his date of birth was July 8, 2000. At the hearing, the IJ questioned Amadou about his statements to the Panamanian authorities. At the conclusion of the hearing, the IJ stated that "substantial prima facie evidence" supported Amadou's claim to be a minor. The IJ warned that the government's speculation about Amadou's "adult" appearance was not persuasive evidence to the contrary. He ordered ICE to provide additional

evidence of Amadou's age, suggesting that a forensic dental examination was typically dispositive.

47. Approximately one week later, on or about February 1, 2018, ICE conducted a dental examination on Amadou to determine his age. The results of the dental exam indicated a statistical age range of 16.03 to 22.37 years old.

48. Upon reviewing these results, the IJ found that they were incompatible with ICE's finding that Amadou was 25, but rather corroborated the other credible evidence that he was 17.

49. Under ICE's own policy for evaluating medical age assessments, the statistical likelihood that Amadou was a minor was too high for him to be processed as an adult. *See* U.S. Immigration and Customs Enforcement, *Field Officer Juvenile Coordinator Handbook*, at 21 (Sept. 1, 2017) (the probability that an individual has reached 18 years old must be 75 percent or higher to detain them as an adult). Amadou's dental exam indicated that he fell short of this threshold.

### F. ICE Continues to Detain Amadou Despite Substantial Credible Evidence That He Was A Minor

50. On or about February 20, 2018, the Embassy of Guinea verified that Amadou's birth certificate was authentic.

51. Despite the Embassy's verification of Amadou's birth certificate, the results of ICE's dental examination, the IJ's finding that Amadou's testimony was consistent with the dental examination, Amadou's October 2017 sworn statement, and Amadou's repeated claims that he was not an adult, ICE continued to detain him in an adult detention facility for another full month after the IJ found Amadou to be credible.

52. On February 27, 2018, ICE finally transferred Amadou to ORR custody. At this point, Amadou had been imprisoned in an adult facility for ***over four months***.

53. On February 27, 2018, ICE transported Amadou to an ORR facility in Chicago, Illinois.

54. Amadou remained at the ORR facility until May 23, 2018, when he was released to his

cousin in New York.

55. In the face of the overwhelming evidence of Amadou's minority status, Defendant's failure to notify ORR of Amadou's claim of minority, make a "prompt determination" of his age based on multiple forms of evidence, and/or transfer Amadou to ORR custody, *for over four months*, constitutes outrageous, willful and wanton conduct that demonstrated a reckless indifference to Amadou's health, safety, and rights.

### G. Amadou Has Suffered Severe Emotional, Physical and Mental Injuries as a Result of His Detention at PIDC

56. Defendant's actions during the detention and unlawful imprisonment were the proximate cause of considerable emotional, physical, and mental distress to Amadou. The harm Amadou suffered was a natural and foreseeable consequence of Defendant's actions.

57. Amadou suffered depression, anxiety, stress, and humiliation while detained at PIDC. He cried frequently and was often unable to sleep due to his fear and anxiety. He often had nightmares which further interfered with his ability to rest.

58. Moreover, at PIDC, Amadou was hindered from contacting family members in Guinea and the United States. He did not have access to counseling services to address the deep emotional and psychological distress he suffered as a minor in an adult detention center. He did not have access to an attorney who could have explained his legal situation to ease his fears. Counseling, social services, and consistent phone contact with family would have been available to him in an ORR facility. Indeed, his detention in an adult facility was substantially different from what he would have – and ultimately did – experience while in the ORR facility four months later.

59. The mental and psychological effects of Amadou's detention have continued to manifest even after his transfer from PIDC and release from ORR custody. Amadou suffers from depression, anxiety, and continues to have nightmares as a result of his unlawful detention in an

adult facility. He remains afraid that Defendant's officers will once again detain him, separate him from his family and community, falsely imprison him, and deport him to a country where he fears persecution.

60. Defendant is liable to Amadou for these actions and omissions under the FCTA.

## COUNT I – FEDERAL TORT CLAIMS ACT, FALSE IMPRISONMENT

61. Amadou re-alleges and incorporates the paragraphs above as if set forth fully herein.

62. Under Texas law, false imprisonment occurs when there is a (1) willful detention; (2) without consent; and (3) without authority of law.

63. Defendant intentionally and willfully detained Amadou in PIDC for over four months, willfully ignoring and/or disregarding the substantial evidence of Amadou's minority status, including his sworn statements, authenticated birth certificate and the findings of the Immigration Judge.

64. Amadou did not consent to his detention in PIDC.

65. Defendant's detention of Amadou at PIDC was without authority of law. Detaining Amadou in adult detention – and particularly given the substantial objective evidence of Amadou's minority – violated the statutory mandates of the TVPRA. The detention also violated the Flores Settlement Agreement and Defendant's own policies.

66. No exceptional circumstances existed to justify Amadou's detention in an adult detention facility, let alone for a duration of four months.

67. Under the FTCA, the United States is liable to Amadou for damages resulting from its false imprisonment of him.

## COUNT II – FEDERAL TORT CLAIMS ACT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

68.     Amadou re-alleges and incorporates the paragraphs above as if set forth fully herein.

69.     Under Texas law, a plaintiff may recover for intentional infliction of emotional distress where: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.

70.     Upon information and belief, Defendant intended to cause, or acted with a reckless disregard of the probability of causing, Amadou to suffer severe emotional distress, as demonstrated by its willful ignorance of the objective evidence demonstrating Amadou's minority status.

71.     Defendant's conduct was both extreme and outrageous. By ignoring the evidence that Amadou presented that he was, in fact, a minor – including his sworn statement, authentic birth certificate and the findings of its own dental exam – and instead detaining him for over four months in an adult facility, Defendant engaged in objectively outrageous conduct that exceeds the bounds of decency.

72.     As a direct and proximate result of Defendant's conduct, Amadou suffered severe emotional distress, including anxiety, fear, depression and nightmares, all of which persist through the present.

73.     Under the FTCA, the United States is liable to Amadou for damages resulting from its intentional infliction of emotional distress.

<strong><u>COUNT III – FEDERAL TORT CLAIMS ACT,<br>NEGLIGENCE</u></strong>

74.     Amadou re-alleges and incorporates the paragraphs above as if set forth fully herein.

75.     As a minor child in Defendant's custody and care, Defendant owed Amadou a duty of ordinary care to avoid causing him foreseeable harm.

76. A "special relationship" also existed between Amadou and Defendant pursuant to the TVPRA, the Flores Settlement, and Defendant's own internal policies, as described above. As a result, Defendant had a legal duty to protect Amadou from foreseeable harms.

77. Defendant breached its duty of care to Amadou by ignoring the evidence that Amadou presented that he was, in fact, a minor – including his sworn statement, authentic birth certificate, the findings of the dental exam and the findings of an Immigration Judge – and instead detaining him for over four months in an adult facility, including the four (4) weeks after the Immigration Judge's conclusion that there was prima facie evidence that Amadou was in fact a minor.

78. Defendant's failure to comply with its statutory obligations imposed by the TVPRA and the mandates of the Flores Settlement Agreement, including its failure to notify ORR of Amadou's claim that he was a minor and/or failing to take the required steps to verify Amadou's minor status, constitutes negligence *per se* and is evidence of Defendant's breach of its duty to Amadou.

79. Amadou's emotional distress, depression, anxiety, fear and other injuries sustained as a result of being kept in an adult detention facility for over four months were proximately caused by, and are the foreseeable result of, Defendant's breach of its duty of care to Amadou.

80. Under the FTCA, the United States is liable to Amadou for damages resulting from its negligent actions and omissions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) Enter judgment against Defendant United States of America and in favor of Plaintiff;

(b) Order Defendant to pay Plaintiff an amount that will fully and fairly compensate him for his past and prospective damages, in an amount to be proven at trial;

(c) Award punitive damages against Defendant, in an amount to be determined at trial;

(d) Award Plaintiff reasonable attorneys' fees and costs, as provided by 28 U.S.C. § 2412 and/or any other provision of law; and

(e) Award Plaintiff all other relief that the Court deems just, proper and equitable.

Dated: September 14, 2021                    Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Lauren T. Lee*
Lauren T. Lee (LL0820)
Maureen K. Schad (Admission Pending)
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 408-5100
Facsimile: (212) 318-3400
Lauren.lee@nortonrosefulbright.com
Maureen.schad@nortonrosefulbright.com

*Attorneys for Plaintiff Amadou Barry*